# EXHIBIT B

LAW OFFICES
# CORETTE BLACK CARLSON & MICKELSON, P.C.

A PROFESSIONAL CORPORATION

ROBERT M. CARLSON
MARSHAL L. MICKELSON
MARIE KAGIE-SHUTEY
ANGELA K. HASQUET
CLARK R. HENSLEY

Mayer Building
129 West Park Street, Suite 301
P.O. Box 509
Butte, Montana 59703

Telephone (406) 782-5800
Fax (406) 723-8919
email chensley@cpklawmt.com

Of Counsel:
WILLIAM M. KEBE, JR.

Retired:
R.D. CORETTE
GREGORY C. BLACK

June 6, 2018

max.davis@dhhtlaw.com and mail
Maxon R. Davis
Davis, Hatley, Haffeman & Tighe, P.C.
101 River Drive North
Milwaukee Station, Third Floor
P.O. Box 2103
Great Falls, MT 59403-2103

Re: Emerick v. Washington National Insurance Company
Our File: F3226-G7361

Dear Maxon:

Please be advised that we have been retained by our clients Anna Fabatz and Kevin Emerick (Kevin), to pursue certain claims against Washington National Insurance Company (WNIC) based on a critical illness insurance policy. As you are aware, our clients previously retained Jeff Dahood to pursue claims against WNIC and you represented WNIC in that matter. On May 26, 2016, based on Mr. Dahood's advice, our clients signed a release[1] only for claims against WNIC relating to Kevin's cancer insurance policy (Policy No. 303326822). Based upon our review of the pleadings in that case and the release we have in our possession, our client's claims against WNIC under Kevin's critical illness insurance policy (Policy No. CM00060610 hereinafter "Policy") remain viable. If you are no longer representing WNIC against our client's claims, please advise and we will direct our communication to Kimberly Harris of WNIC. Otherwise, please accept this demand letter.

## FACTS

On September 10, 2012, WNIC's agent David Scott (David) completed an application for the Policy with information provided by Kevin. When asked about the health/eligibilities questions in Section III of the application, Kevin immediately disclosed his recent testosterone replacement therapy and elevated prostate specific antigen (PSA) levels. Kevin also advised that he had a urinary tract infection at the time of his elevated PSA levels, which he believed caused

---

[1] Our clients obtained the release that we have in our possession from you because Mr. Dahood refused to deliver them a copy of the release they signed in his office. Our clients believe they signed a different release in Mr. Dahood's office but that dispute is immaterial to this letter and will be taken up with Mr. Dahood.

Maxon Davis
June 6, 2018
Page 2

the elevation. His belief was further supported by the fact that after his urinary tract infection subsided with use of antibiotics, his PSA levels returned to normal. As a result, Kevin advised he did not obtain a prostate biopsy. Based on the information provided by Kevin, David determined he was eligible for the Policy and checked "No" on all the boxes in Section III of the application. *See* Exhibit A attached (letter from David regarding his role in enrolling Kevin for the Policy).

On September 11, 2012, WNIC accepted the application and issued Kevin the Policy with limits of $20,000. Under the Policy, WNIC agreed to pay Kevin the limits in lump sum form if he was diagnosed for the first time as having a specified critical illness which included prostate cancer. The Policy also provided that WNIC's failure to pay within thirty days of receipt of the insured's proof of loss entitles the insured to nine percent (9%) interest per annum from the end of the thirty-day period to the date payment is actually made.

In mid-February 2014, Kevin was diagnosed with prostate cancer and timely filed his claim under the Policy on March 4, 2014. Despite his timely claim and premium payments, WNIC unfoundedly rejected his claim based on an alleged "misrepresentation" on his application.

## **BREACH OF CONTRACT**

Under Montana law, general rules of contract law apply to insurance policies and insurance policies are strictly construed against insurers and in favor of insureds. *Travelers Cas. and Sur. Co. v. Ribi Immunochem Research, Inc.*, 2005 MT 50, ¶ 17, 326 Mont. 174, 108 P.3d 469. Damages for breach of contract include all amounts necessary to compensate the non-breaching party for all the detriment proximately caused by the breach. Mont. Code Ann. § 27-1-311.

Here, Kevin was diagnosed with prostate cancer in mid-February 2014 and timely filed his claim with WNIC on March 4, 2014. Under the clear terms of the Policy, WNIC was obligated to pay Kevin $20,000 by April 3, 2014. WNIC breached the insurance contract by failing to pay Kevin by that date. Additionally, the clear terms of the Policy entitle Kevin to nine percent (9%) interest per annum or $1,800 per year from April 3, 2014, until paid. Nearly four years and three months have passed since April 3, 2014. As a result, Kevin is also entitled to interest in the amount of $7,650 ($1,800/year x 4.25 years). To date, Kevin's total damages based solely on WNIC's breach of contract are $27,650.

WNIC's defense that Kevin misrepresented his health on his application is without merit. The question in the application that WNIC relies on to allege misrepresentation inquires as to whether Kevin had, within the past five years, "been treated for or diagnosed as having a pre-leukemic condition, a pre-malignant condition or a condition with malignant potential?" Notwithstanding the fact that the application failed to define "pre-malignant condition" or "a condition with malignant potential," Kevin had not been treated for or diagnosed with any such condition. Rather, Kevin had been treated for testosterone replacement and a urinary tract infection, neither of which are pre-malignant conditions or conditions with malignant potential.

Maxon Davis
June 6, 2018
Page 3

Furthermore, elevated PSA levels are a symptom not a diagnosis. Therefore, no misrepresentation ever occurred.

Alternatively, to play devil's advocate, even if Kevin's answer on the application could be considered a misrepresentation, WNIC's defense still fails because it knew of his prior treatment and elevated levels at the time of his application. Under Montana law, a principal is deemed to have knowledge of information known to its agent. Mont. Code Ann. § 28-10-604; *Ahmann v. Minnesota Mutual Life Insurance Co.*, 83 Fed.Appx. 958, 962 (2003) (unpublished) (reversing summary judgment for the insurer because issues of fact existed as to the insurance agent's knowledge of the alleged misrepresentation); *see also* Mont. Code Ann. § 1-1-217(2). Additionally, Montana follows the rule of law that prevents insurance companies from rescinding policies based on alleged misrepresentations when the insurer has actual or inquiry notice of the facts allegedly misrepresented. *Webber v. Massachusetts Bonding & Ins. Co.*, 81 Mont. 351, 263 P. 101, 103-104 (1928); *Steinback v. Bankers Life & Cas. Co.*, 2000 MT 316, ¶ 13, 302 Mont. 483, 15 P.3d 872; *Ahmann*, at 962. "An insurance policy is not avoided if the insurer knows the facts or the falsity of the statement or has sufficient indications that would put a prudent person on notice so as to induce inquiry which, if done with reasonable thoroughness, would reveal the truth." *Steinback*, at ¶ 13.

In *Webber*, the Montana Supreme Court specifically held that the insurance company was estopped from rescinding its insured's policy because its agent's knowledge was "imputed to [the insurer], who [was] deemed to have issued the policy after acquiring such knowledge, and not on the faith of the misrepresentations in the application due to the act or mistake of the agent." *Id.* at 104. There, the insurer's agent filled out an application for the insured and marked "No" to a question regarding any prior appendicitis even though the insured had advised of a prior procedure for appendicitis. *Id.* at 103. Since the prior procedure was over with, the insurer's agent believed it would not affect the policy and submitted the application. Later, the insured made a claim under the policy and the insurer denied the claim due to the alleged misrepresentation. *Id.* at 103-104. The Montana Supreme Court rejected the insurer's claim of misrepresentation because its agent clearly had knowledge of the insured's condition. *Id.* at 104.

The present case is synonymous to *Webber* and its precedent will control the issue. Here, David was a general agent for WNIC[2] and filled out Kevin's application for the Policy based on the information Kevin supplied. Kevin indisputably provided David all of the information that WNIC now claims constitute a misrepresentation. David indisputably had knowledge of Kevin's prior testosterone replacement therapy and elevated PSA levels. *See* Exhibit A. Under longstanding Montana precedent and statutes, David's knowledge was imputed to WNIC and, as a matter of law, no misrepresentation could have occurred. Thus, WNIC should have been estopped from rescinding the Policy and its failure to timely pay Kevin the policy limits breached the Policy.

---

[2] Even if David was an independent soliciting agent, the outcome would not change as Montana law would still deem him to be WNIC's agent as the Policy had already been selected. *Monroe v. Cogswell Agency*, 2010 MT 134, ¶¶ 43-44, 356 Mont. 417, 234 P.3d 79.

Maxon Davis
June 6, 2018
Page 4

## ATTORNEY FEES

As another element of damages in this case, Montana law clearly requires WNIC to pay Kevin's attorney fees in enforcing the Policy. The Montana Supreme Court specifically held an insured is entitled to recover attorney fees when the insurer forces the insured to assume the burden of legal action to obtain the full benefit of the insurance contract. *Mountain West Farm Bureau Mut. Ins. Co. v. Brewer*, 2003 MT 98, ¶ 36, 315 Mont. 231, 69 P.3d 652; *Estate of Gleason v. Central United Life Ins. Co.*, 2015 MT 140, ¶¶ 81-84, 379 Mont. 219, 350 P.3d 349; *Mlekush v. Farmers Ins. Exchange*, 2017 MT 256, ¶¶ 20-21, 389 Mont. 99, 404 P.3d 704.

This case presents a first-party insurance dispute to recover the benefits of an insurance contract; thus, attorney fees are compensable. Due to WNIC's unfounded denial of Kevin's claim for benefits, Kevin was forced to seek legal counsel to obtain the benefits of the Policy. Therefore, Kevin is absolutely entitled to attorney fees in this case.

## ADVANCE PAY

Montana law requires insurers to advance pay damages under insurance policies when liability is reasonably clear. Mont. Code Ann. § 33-18-201(6); *Ridley v. Guaranty Nat'l Ins. Co.*, 286 Mont. 325, 334-335, 951 P.2d 987, 992-993; *DuBray v. Farmers Ins. Exchange*, 2001 MT 251, ¶¶ 13-14, 307 Mont. 134, 36 P.3d 897.

Here, Kevin's damages for WNIC's breach of contract are more than reasonably clear. Based on the facts, including David's undisputed knowledge and letter and the law referenced above, WNIC does not have any basis in law or in fact for contesting Kevin's right to the Policy's limits. Those damages include the $27,650 owed under the Policy, as well as Kevin's attorney fees of $9,207.45 to obtain his right to benefits under the Policy. Due to WNIC's failure to pay Kevin under the Policy, Kevin has not been able to obtain the necessary treatment for his prostate cancer. Advance payment of the undisputed amount owed under the Policy may help Kevin obtain the necessary treatment for his ailment. Therefore, Kevin respectfully requests WNIC to advance pay $36,857.45 immediately.

## BAD FAITH

In addition to Kevin's breach of contract claim, Kevin also has several claims for bad faith under Mont. Code Ann. § 33-18-242. Specifically, for over four years, WNIC has (1) continuously misrepresented pertinent facts relating to Kevin's coverage, including but not limited to that it did not have knowledge of his elevated PSA levels at the time of his application; (4) continuously refused to pay his claims without conducting a reasonable investigation as any sort of investigation would have revealed David's knowledge of Kevin's elevated PSA levels at the time of his application; (5) continuously failed to affirm coverage of Kevin's claims within a reasonable time after his poof of loss statement was completed; and, (6) continuously neglected to attempt in good faith to effectuate a prompt, fair, and equitable settlement when liability has been reasonably clear. Mont. Code Ann. § 33-18-201(1), (4), (5), (6). As a proximate cause of

Maxon Davis
June 6, 2018
Page 5

WNIC's conduct, Kevin has not received his bargained for exchange under the Policy, has been forced to incur attorney fees and costs to enforce his rights under the Policy, and has suffered extreme emotional distress and possible lost chance in combating his cancer due to his financial constraints in seeking the treatment he needs for his prostate cancer. *See Estate of Gleason*, supra, at ¶¶ 52-53; *Jacobsen v. Allstate Ins. Co.*, 2009 MT 248, ¶ 66, 351 Mont. 464, 215 P.3d 649. Furthermore, based on WNIC's clear liability in this case, its conduct in failing to pay Kevin under the Policy was clearly malicious authorizing an award of exemplary damages against it. Mont. Code Ann. §§ 33-18-242(4), 27-1-221.

We await WNIC's decision to advance pay the $36,857.45 previously demanded to negotiate a settlement of our client's bad faith claims.

## CONCLUSION

We hope this letter adequately explains the extent of WNIC's liability to our clients. It is our clients' hope that we can amicably resolve this case without the need for costly litigation. In that respect, please accept responsibility for WNIC's breach of the Policy and advance pay the undisputed $36,857.45 by June 15, 2018.

If you have any questions, comments, or concerns, please do not hesitate to contact me at your earliest convenience.

Yours very truly,

CORETTE BLACK CARLSON & MICKELSON

By _____
Clark R. Hensley

CRH/ss
Enclosure

David D. Scott-Agent # CDF06                                6-25-2014
RR#1 Box394
Greenfield IL 62044

Attn: Kimberly Harris
Washington National Insurance Company
PO Box 1916
Carmel IN 46082-1916

Ms. Harris,

First of all after reading the letter from Policy Holder "Kevin Emerick" referring to PO# "CM00060610 & 303326822." He doesn't seem to be leveling a complaint in regards to my "sales and servicing" of the policy BUT with the lack of claim payment and the tone of the claim letter in reference to his integrity.

As best of my recollection the following is my statement:

Mr. Emerick and I met to discuss our Washington National Cancer and Heart Care Policies; he was referred to me by a policy holder. We first discussed the Heart Care Plan but after a lengthy discussion and review of the eligibility questions I advised him he would not be eligible for any heart care options from our company due to his past medical history regarding his past heart condition. If he would have not been as HONEST and upfront with me answering the medical questions I could have possibly offered him a Heart Care Plan or the Critical Solutions option for Heart Attack and Stroke coverage. But due to his HONESTY we both mutually agreed there would not be an option of Heart Coverage from our company.

We moved on to discussing the Cancer Aid Policy and I discussed fully with him (as I was trained) the Cancer Aid Program. We then reviewed the Health/Eligibility Questions. During our conversation, almost immediately Mr. Emerick mentioned that he had made a previous doctor visit for testosterone replacement therapy. At the time Mr. Emerick mentioned that he was placed on antibiotics that were prescribed by his general practitioner for urinary tract infection. The general practitioner scheduled him an appointment with urologist at the time because Mr. Emerick had an elevated PSA level. The urologist suggested a biopsy for precautionary reasons. Mr. Emerick did not take the biopsy because he had a business trip planned for a couple weeks. Upon returning from his trip Mr. Emerick stated his urinary tract infection was clear and his PSA had dropped due to the antibiotics. He did not feel it was necessary to take such an evasive procedure such as a biopsy if his readings were in the safe range.

After the above conversation and us again reviewing the health questions I did not surmise that Mr. Emerick had been diagnosed with any cancer the last 10 years. I saw no evidence of pre-malignant condition. So acting in good faith I sold Mr. Emerick the Cancer Aid Program and also a Critical Solutions policy-Cancer Only.

In closing I felt Mr. Emerick is an honest and forthright person. Based on the validity of the information he gave me I will go on record as stating that he should not have had this claim denied. At no time in my training have I been instructed that I should deny a client access to our cancer products based on a past elevated PSA level and/or a negative biopsy or the clients refusal at one time to not taking an advised biopsy. If so then we as agents are being trained improperly and should be required to take additional extensive in depth medical training to understand better what we should be denying clients for in the future.

Thank You,

*David D. Scott*
Agent CDF06